LACREASHA A. KENNEDY-JARVIS;
LAWSHAWN D. LEWIS; DEREK JARVIS,

*Plaintiffs,*

v.

Civil Action No. 13-1596 (RDM)

CALVIN REGINALD WELLS,
*Administrator of the Estate of Rose E.*
*Walker,*

*Defendant.*

## <u>MEMORANDUM OPINION</u>

This case is the latest chapter in a series of protracted disputes over the estates of a

District of Columbia resident, James Jarvis, who died in 2003, and his mother, Rose Walker,

who died in 2000.  The plaintiffs, who are among Jarvis's heirs, argue that Jarvis was denied his

fair share of Walker's estate and that, as a result, they received less than they should have when

Jarvis's estate was distributed.  They allege, in particular, that Calvin Reginald Wells—Jarvis's

nephew, the administrator of the Walker estate, and the defendant in this action—engaged in

various forms of misconduct relating to the Walker estate.  Among other things, they claim that

Wells either fraudulently or through undue coercion obtained partial title to one of Walker's

properties in the weeks immediately before her death; that he fraudulently induced Jarvis to

waive his rights to his inheritance under the terms of Walker's will; and that, as administrator of

Walker's estate, he breached his duties by misappropriating estate assets for his personal use or

benefit.

In an earlier case brought in D.C. Superior Court, the plaintiffs sought to wrest control of the administration of the Jarvis estate from a set of court-appointed representatives on numerous grounds, including for failure to pursue claims against Wells. They subsequently filed suit in this Court, seeking to obtain compensation from the estate administrators for failing to pursue or to protect assets of the estate. Having failed in those efforts, the plaintiffs brought this action directly against Wells, alleging claims for fraud, conversion, and breach of fiduciary duty.

The case is before the Court on the parties' cross-motions for summary judgment. Dkts. 57, 67. Because the Court concludes the plaintiffs' claims are time-barred, it will grant Wells's motion for summary judgment and deny the plaintiffs' cross-motion for summary judgment.

## I. BACKGROUND

### A. Walker's Death and Probate Proceedings

The plaintiffs—LaCreasha Kennedy-Jarvis, LaShawn Lewis, and Derek Jarvis—are the heirs of James Jarvis, a Washington, D.C., resident who died on June 3, 2003. Compl. ¶¶ 3, 7–9. The present lawsuit arises out of events that occurred in and around March 2000, when Jarvis's mother, Rose Walker, died of cancer at age 77 in Plainfield, New Jersey. *See id.* ¶¶ 2–3. Upon Walker's death, a dispute broke out between Jarvis and Wells regarding who would administer her estate. Walker had named United National Bank as the executor of her estate, Dkt. 57-3 at 3 (Pls.' MSJ, Ex. C), but, for reasons that are disputed by the parties and are not relevant here, the bank declined to serve as executor, Dkt. 67-3 at 2 (Def.'s MSJ, Ex. C, ¶ 4) ("Wells Aff."). Both Jarvis and Wells sought the position of estate administrator, and, after a hearing, the New Jersey probate court appointed Wells as administrator of Walker's estate. *Id.* (Wells Aff. ¶ 7); Dkt. 57-8 at 2 (Pls.' MSJ, Ex. H).

The allegations of fraud, conversion, and breach of fiduciary duty at the heart of this case concern Wells's management of Walker's estate. Walker's will, which the plaintiffs filed as an exhibit to their motion for summary judgment, provided specific directions to the administrator of the estate regarding the distribution of the estate's assets. As relevant here, the will instructed the administrator "to sell all real estate and all other items of value" as soon "after [her] death as may be practicable" and provided that "the net proceeds of the sale" of those assets should be made part of the residuary estate. Dkt. 57-3 at 2 (Pls.' MSJ, Ex. C). The will further directed the estate administrator to establish a trust for the benefit of three people: Jarvis, Wells, and Wells's brother Alvin. *Id.* at 3. The trust, consisting of the remaining assets in the estate, was to be paid out over the course of five years (20 percent each year) to the beneficiaries "in equal shares." *Id.* The plaintiffs allege that Wells, over a period of time beginning in March 2000—shortly before Walker's death—and continuing to today, has "engaged in a series of fraudulent or improper acts designed to deprive [Jarvis] of a substantial portion of his share of the estate." *Kennedy-Jarvis v. Wells*, 113 F. Supp. 3d 144, 148 (D.D.C. 2015). Wells contests the thrust of the allegations made by the plaintiffs, but the Court will describe them for the sake of completeness.

First, the plaintiffs allege, Wells coerced Walker—eleven days before her death—into executing a document that transferred ownership of her residence to herself, Wells, and Wells's brother Alvin, thereby shielding two-thirds of the value of the property from Walker's estate. *See* Dkt. 57 at 6–7. The plaintiffs, relying in part on expert reports attached to their reply in support of their motion, argue that Walker was under the influence of medications that would have diminished her capacity and rendered her incapable of understanding the transaction. *Id.* at 7; *see* Dkt. 69-2 at 3 (Pls.' Reply, Ex. B). Alternatively, they argue, Wells may have forged Walker's signature outright, rendering the conveyance void. Dkt. 57 at 7; *see* Dkt. 69-6 at 4

(Pls.' Reply, Ex. D). Wells does not dispute that Walker partially transferred the ownership of her residence to him shortly before her death, but—relying in part on an affidavit filed by his mother Joan, Walker's daughter—he denies that Walker was coerced into transferring the property to him or that she was incompetent. *See* Dkt. 67 at 11; Dkt. 67-5 at 3–4 (Def.'s MSJ, Ex. E, ¶¶ 12–15) ("Taylor Aff.").

Second, the plaintiffs allege, Wells intentionally under-represented the value of Walker's estate in order to diminish Jarvis's share of the estate's assets—while simultaneously converting estate assets to his own personal benefit. Dkt. 57 at 4–7. Specifically, they claim, Wells twice represented to the New Jersey probate court that the estate was worth only $566,500. *See* Dkt. 57 at 2; Dkt. 57-2 at 2 (Pls.' MSJ, Ex. B); Dkt. 57-4 at 2 (Pls.' MSJ, Ex. D). Between 2000 and 2004, however, they allege, Wells sold or conveyed properties that had belonged to Walker for a total sum of over $1.4 million. *See* Dkt. 57 at 7–8; Dkt. 69-3 at 7 (Pls.' Reply, Ex. C). The plaintiffs also allege that Wells misrepresented the value of Walker's personal property. Dkt. 57 at 5. They argue that Jarvis's share of the estate should have been over $500,000, but that—as a result of Wells's fraud, conversion, and breach of fiduciary duty—he received only $257,500. *Id.* at 8.

Third, and relatedly, the plaintiffs allege that Wells fraudulently induced Jarvis to sign a document releasing his right to his share of the Walker estate in exchange for a cash payment of $15,000 and title to one of Walker's properties. Dkt. 57 at 6; *see also* Dkt. 67-2 at 1 (Def.'s MSJ, Ex. B) ("Release"). Wells alleges that Jarvis approached him shortly after his appointment as estate administrator and "proposed an arrangement" in which he would receive $15,000 cash, and title to the property, as "full satisfaction of his share of the estate." Dkt. 67-3 at 8 (Wells Aff. ¶ 29). Wells alleges that Jarvis proposed the arrangement because he "did not wish to wait

five . . . years for distribution" of the estate assets. *Id.* at 13 (Wells Aff. ¶ 44). The plaintiffs argue that Jarvis's release is invalid because it was not properly notarized and filed, but also argue that even if the release is facially valid, it was fraudulently induced given Wells's representations regarding the value of the Walker estate. Dkt. 69 at 5. Wells, for his part, denies that he made any false or misleading statements to Jarvis and denies that he concealed any estate assets. Dkt. 67-3 at 13 (Wells Aff. ¶¶ 42–43).

**B.      Jarvis's Death, Probate Proceedings, and Ensuing Litigation**

Jarvis himself made none of these allegations in his lifetime. When he passed away in 2003, however, his heirs—including the plaintiffs—began what has now become over a decade of litigation over his estate. The litigation began just after Jarvis's death in 2003, when his heirs initiated proceedings to preclude one of Jarvis's daughter's, Greer Burriss, from appointment as administrator of Jarvis's estate. *See Lewis v. Parker*, 67 F. Supp. 3d 189, 194 (D.D.C. 2014); *see* Dkt. 74-3 at 17 (Def.'s Supp. Brief, Ex. C, at 17) ("*In re Jarvis* Docket").[1] In 2004, the probate court appointed Darrel S. Parker, a Washington, D.C., attorney, as estate representative. *See id.* Parker promptly petitioned the probate court for an order directing Burriss to show cause why she should not return to the estate a Cadillac car that had belonged to Jarvis, but, on the estate's behalf, Parker entered into an agreement with Burriss in February 2005 in which the estate agreed to release any claims it might have against her. *See Lewis*, 67 F. Supp. 3d at 194–95.

In July 2005, motivated in part by what they viewed as Parker's misconduct in releasing the estate's claims against Burriss, the plaintiffs filed a complaint in probate court to remove him as estate administrator. *Id.* at 195; *see* Dkt. 74-2 (Def.'s Supp. Brief, Ex. B) ("D.C. Compl.").

---

[1] The public docket for Jarvis's probate proceedings can be found by searching for "James Jarvis" at https://www.dccourts.gov/cco/maincase.jsf.

The plaintiffs also sought unspecified damages. *Id.* at 1 (D.C. Compl. 1). In their complaint, the plaintiffs argued that Parker had failed to keep them apprised of his actions as representative, had failed to marshal and account for estate assets, and had failed properly to pursue the estate's claims against Burriss. *Id.* at 1–18 (D.C. Compl. 1–18). But the plaintiffs also alleged that "[t]he most compelling case of [Parker's] neglect" was his failure to pursue potential claims by the estate for assets arising out of the Walker estate. *Id.* at 19–20 (D.C. Compl. 19–20). The complaint specifically alleged:

> [Jarvis]'s mother[] Rose Walker willed that all of her personal and real property be sold as soon as practicable after her death and that the proceeds from the sales be placed in a trust fund to be dispersed in twenty (20) percent increments of the total value over the course of five (5) years . . . to the three beneficiaries in equal shares. The real property alone has sold for <u>$1,841,040.00</u> as of 2004. Under Ms. Walker's will, the decedent had the right to one-third (1/3) of the aforementioned value, specifically, $613,680.00. Due to Mr. Parker's negligence and lack of diligence by not discussing all issues of the estate with each and every heir and in ignoring their pleas that he look into the matter, he never discovered this major wrinkle in the disposition of the Jarvis estate. The heirs intend on instituting a civil action against the Executor to the Walker estate for negligence in New Jersey by misrepresenting the true value of the Walker estate to the New Jersey Probate Court by excluding several real properties of the decedent and all of her personal property, for the outstanding value of James P. Jarvis' inheritance; interest; and punitive damages and/or treble damages; amounting to **<u>$1,841,040.00+</u>**.

*Id.* (emphasis in original). The complaint was filed *pro se* by the plaintiffs, but it requested that the probate court appoint James Zeas, the plaintiffs' current counsel, as estate administrator, and it appear from the record in the probate litigation that Zeas appeared in August 2005 before the probate court and stated "that he would be representing all the beneficiaries of the estate." *Id.*; Dkt. 74-3 at 15 (*In re Jarvis* Docket, Aug. 10, 2005 Scheduling Order).

The proceedings against Parker in probate court continued for the next four years, until March 2009. *See* Dkt. 72-3 at 1 (Def.'s Reply, Ex. C, at 1) ("*In re Jarvis* Removal Order"). In

July 2007, apparently in response to a motion for clarification, the probate court issued an order

clarifying that the only relief available to the plaintiffs pursuant to their complaint was Parker's

removal, not money damages.  *In re Jarvis*, Adm. No. 1036-03 (D.C. Super. Ct. July 25, 2007)

("*In re Jarvis* Clarification Order").[2]  In that order, the probate court specifically rejected the

plaintiffs' argument that they could seek damages from Parker stemming from his failure to

marshal estate assets (such as his claim to a greater share of the Walker estate).  It explained:

> It is Plaintiff[s'] burden to demonstrate that there were funds belonging to the
> deceased, which assets Mr. Parker could have recovered and due to his dereliction
> of duty the funds are no longer recoverable.  The court may consider any such
> dereliction of duty as the basis for removal.  In addition, if Plaintiffs demonstrate
> any sum certain, Mr. Parker could be held responsible.  But then, it would be for
> the successor personal representative to make the recovery from Mr. Parker, his
> surety or both.  And so again, we come up to the point that the only action here is
> for the removal of Mr. Parker.

*In re Jarvis* Clarification Order, at 9–10.[3]

In August 2008, the probate court held a trial regarding the plaintiffs' complaint against

Parker.  *See* Dkt. 74-3 at 3–4 (*In re Jarvis* Docket); Dkt. 72-3 at 2 (*In re Jarvis* Removal Order

2).  Two of the plaintiffs—LaCreasha Kennedy-Jarvis and Derek Jarvis—testified as to Parker's

alleged breaches of his fiduciary duty.  *Id.*  At the close of the trial, the probate court found that

Parker had "mismanaged property" and "failed . . . to fulfill the duties of his office" by failing to

marshal four specific assets for the estate: a payroll check for $618 made out to Jarvis by a D.C.

---

[2]  The Court may take judicial notice of public records, such as the probate court's opinion in *In re Jarvis*, in adjudicating a motion for summary judgment.  *See Covad Comm'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).  The clarification order is attached as an exhibit to a brief filed by the plaintiffs in their second federal action against Parker, discussed below.  *See* Pls.' Opp'n to Mot. to Dismiss, Ex. A, *Lewis v. Parker*, 67 F. Supp. 3d 189 (D.D.C. 2014) (No. 14-163, Dkt. 17-3).

[3]  The plaintiffs also apparently filed a complaint in New Jersey probate court around this time, seeking to reopen the Walker estate.  Zeas represents that he was denied leave to appear *pro hac vice* in that proceeding.  *See* Dkt. 76 at 3 n.2.

agency, a 1995 Cadillac, a claim against the assets of Jarvis's father's estate, and funds that had

been automatically withdrawn from Jarvis's bank account after his death. *Id.* at 20–25; *see also*

*Lewis*, 67 F. Supp. 3d at 197. With respect to the assets that had belonged to the Walker estate,

however, the probate court concluded that Parker had not violated his fiduciary duties, because

the plaintiffs had "failed to prove that Parker had information that he could use to attempt to

locate the property and marshal it for the estate." Dkt. 72-3 at 16 (*In re Jarvis* Removal Order

18). The probate court ordered Parker removed as estate administrator. *Id.* at 23 (*In re Jarvis*

Removal Order 25). Both parties appealed—Parker his removal and the plaintiffs the probate

court's order on damages—but in April 2012 the D.C. Court of Appeals affirmed the probate

court's orders "in all respects." Dkt. 76-3 at 2 (Pls.' Supp. Brief, Ex. C, at 1). With respect to

the court's damages order, the Court of Appeals explained that the probate court was correct to

hold that the successor personal representative (not the plaintiffs) was the "appropriate party to

seek such damages" from Parker, but also stated that it did not construe the "court's order as

foreclosing [the plaintiffs'] ability to obtain damages from Mr. Parker if the successor personal

representative elects not to pursue damages." *Id.* at 3 (Pls.' Supp. Brief, Ex. C, at 2).

In March 2013, the plaintiffs filed suit in this court against Parker and Hope Brown, the

successor representative. *Jarvis v. Parker*, 13 F. Supp. 3d 74, 75 (D.D.C. 2014). The plaintiffs

brought claims against Parker for damages, alleging that he had failed to marshal estate assets

and that Brown had failed to pursue claims against him on behalf of the estate. But the suit was

dismissed without prejudice for failure to prosecute when the plaintiffs' counsel failed to file a

timely opposition to the defendants' motions. *Id.* at 76. The plaintiffs re-filed their complaint

against Parker and Brown in 2014. *See Lewis*, 67 F. Supp. 3d at 199. Another judge of this

Court dismissed that case with prejudice in September 2014. *Id.* at 210–11. She ruled that the

plaintiffs' claims against Parker were barred by res judicata, as they had been "raised, addressed, and necessarily decided by" the D.C. Court of Appeals. *See id.* at 207. And she held that the plaintiffs' claims against Brown either failed on the merits or were time-barred. *Id.* at 210. "The plaintiffs had their day in court," she wrote, "and this Court need not provide the proverbial 'second bite at the apple.'" *Id.* at 207. Plaintiffs did not appeal that judgment.

## C.     The Present Proceedings

The plaintiffs filed the present case in October 2013, while their first federal case against Parker and Brown was still pending. Dkt. 1. In their complaint, they allege claims for breach of fiduciary duty, conversion, and fraud against Wells, the executor of Walker's estate. Compl. ¶¶ 50–69. In October 2014, Wells filed a motion to dismiss, arguing that the action fell within the probate exception to the Court's diversity jurisdiction. Dkt. 31. The Court concluded that, because the plaintiffs' claims, as a general matter, did not require the Court to "probate or annul a will or administer a decedent's estate," but rather alleged "'widely recognized torts' . . . [that] intertwine[d] with" the administration of an estate, the probate exception did not apply. *Kennedy-Jarvis v. Wells*, 113 F. Supp. 3d 144, 152, 155 (D.D.C. 2015). The case proceeded to discovery, and the parties filed motions for summary judgment in late 2015. Dkts. 56, 57, 67. At the Court's direction, the parties submitted supplemental briefs on whether the action was time-barred in January 2016. Dkts. 74, 76. The motions are now fully briefed.

## II.  LEGAL STANDARD

This matter is before the Court on the parties' motions for summary judgment. Summary judgment is appropriately granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d

889, 895–96 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the outcome of the litigation. *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." *See Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987). When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850 (D.C. Cir. 2006). The non-movant's opposition, however, must consist of more than mere denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-movant must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If his evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50.

## III. DISCUSSION

The parties have cross-moved for summary judgment, Dkts. 57, 67, but the Court need address only one issue raised by the pending motions: whether the plaintiffs' claims are barred

by New Jersey's statute of limitations. Dkt. 67 at 12–14. For the following reasons, the Court concludes that they are.

Wells raises a statute-of-limitations defense in his cross-motion for summary judgment, arguing that the plaintiffs' claims are time-barred, because they "were aware of their potential claim[s] as early as . . . June 3, 2003 . . . and not later than 2005." Dkt. 67 at 13. The plaintiffs originally failed to offer any substantive response to Wells's statute-of-limitations defense, arguing instead that the Court had previously "denied dismissal of the action based on a limitations theory"; that the Court should reject Wells's "attempts to once again resurrect [a] limitations defense that was considered and flatly rejected by this Court"; and that Wells was, in any case, simply "throw[ing] darts asserting various statutory periods being unable to decide between limitations periods from the State of New Jersey or the from the District of Columbia." Dkt. 70 at 3–4. This response was, to say the least, bewildering. The Court had not previously denied a motion to dismiss on statute-of-limitations grounds; it had not previously "considered," much less "flatly rejected," that defense; and Wells had, in fact, clearly argued that the plaintiffs' claims were governed by New Jersey's six-year statute of limitations for "tortious injury to the rights of another," Dkt. 67 at 12–13 (quoting N.J. Stat. Ann. § 2A:14-1). Rather than treat the plaintiffs' failure to respond to the substance of Wells's defense as a concession, however, the Court provided the plaintiffs with a second bite at the apple and directed the parties to file supplemental briefs addressing "the appropriate statute or statutes of limitations." Dkt. 73 at 2.

In response, the plaintiffs filed a brief in which they conceded that a six-year statute of limitations applies to their fraud and conversion claims and posited that a two-year statute of limitations applies to their claim for breach of fiduciary duty. *See* Dkt. 76 at 1–3 (arguing that the plaintiffs "filed the instant action . . . well within the applicable statute of limitations periods

for all of their causes of action: tort of deceit—fraud (6 years); tort of civil conversion (6 years . . .) and breach of fiduciary duty (2 years . . .)"). Even assuming, however, that the plaintiffs' claim for breach of fiduciary duty is governed by the six-year—and not the two-year—statute of limitations, *see, e.g.*, *Balliet v. Fennell*, 845 A.2d 168, 172–73 (N.J. Super. Ct. App. Div. 2004), the plaintiffs can only prevail if the relevant conduct occurred within six years of October 2013, when they filed the present suit.[4] But the plaintiffs did not dispute—and, given the allegations contained in their complaint, cannot dispute—that the events that form the core of their claims occurred between March 2000, when Walker died, and January 2001, when Jarvis signed the document releasing his right to his share of the Walker estate—over a decade before October 2013. Dkt. 1. Those claims, accordingly, are untimely absent the operation of some rule or equitable principle that would delay or toll the statute of limitations. Dkt. 76 at 2. The plaintiffs argue that three such rules apply: (1) the "discovery rule," which provides that a statute of

---

[4] After oral argument on the motions, and at the plaintiffs' request, the Court permitted the plaintiffs to file a short supplemental brief limited to the question "whether, under New Jersey law, a plaintiff is entitled to equitable tolling where suit could have been brought earlier—but was not—by the plaintiff's representative or agent." Feb. 1, 2016 Min. Order. In this second supplemental brief, the plaintiffs raised two additional arguments for the first time: (1) that *some* of their conversion claims against Wells are governed not by the six-year statute of limitations set out in § 2A:14-1, but by a twenty-year statute of limitations applicable to "action[s] at law for real estate," N.J. Stat. Ann. § 2A:14-7; and (2) that, as a matter of New Jersey law, "[t]here is no statute of limitations on an Administrator's liability for improper exercise of power during his entire administration of an estate." Dkt. 77 at 1–3. The plaintiffs' late effort to raise these new arguments fails. By the time the plaintiffs filed their second supplemental brief, the Court had already provided them with an opportunity to cure the deficiencies in their original opposition. But when the plaintiffs filed their first supplemental brief, they explicitly conceded that a six-year (or two-year) statute of limitations applied to their claims, *see* Dkt. 76 at 2–3, and they did not raise any argument as to the existence of a longer (or even an indefinite) limitations period. Moreover, when the Court permitted them to file their second supplemental (fifth overall) brief, it only authorized them to address an entirely different issue. In light of the D.C. Circuit's admonitions that the court need not address an argument raised for the first time in a reply brief, *see McBride v. Merrell Dow & Pharm., Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986), the Court concludes that the plaintiffs have waived these arguments.

limitations does not begin to run until a party has actual or constructive knowledge of his claims; (2) the "continuing tort doctrine," under which a limitations period does not begin to run until a continuous course of wrongful conduct ceases; and (3) general principles of equitable tolling. *Id.* at 2–7. The Court will address each argument in turn.

**A.  Discovery Rule**

The plaintiffs first argue that the "discovery rule" delayed the accrual of their causes of action, rendering them timely. Dkt. 76 at 6–7. The so-called discovery rule "delays the accrual of the action until the plaintiff discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action or provide a basis for an actionable claim." *Henry v. N.J. Dep't of Human Servs.*, 9 A.3d 882, 892 (N.J. 2010) (citations and internal quotation marks omitted). It "seeks to remedy inequity resulting when 'an injured person, unaware that he has a cause of action, is denied his day in court solely because of his ignorance.'" *Id.* at 891 (quoting *Lopez v. Swyer*, 300 A.2d 563, 566 (N.J. 1973)). The problem for the plaintiffs, however, is that even they concede that they "discover[ed]" Wells's alleged breaches no later than July 2005, when they filed their complaint in D.C. Superior Court alleging that Parker had failed to marshal assets arising out of the Walker estate. *See* Dkt. 74-2 at 19–20 (D.C. Compl. 19–20). Thus, even if the discovery rule were to delay the accrual of the plaintiffs' causes of action, it would at most have delayed their accrual until 2005. Standing alone, the discovery rule cannot render the plaintiffs' claims timely.

The plaintiffs attempt to overcome this hurdle by arguing that they did not discover the "whereabouts" of a Jaguar car, which had belonged to Walker, until 2015, and that to this day they "have no idea where all of [Walker's] person property" is, including a grand piano, jewelry, paintings, and rugs. Dkt. 76 at 7. But they alleged as early as 2005, in related litigation, that

Wells misrepresented "the true value of the Walker estate to the New Jersey Probate Court by excluding several real properties . . . *and all of her personal property*." Dkt. 74-2 at 19. The fact that they may not know how Wells ultimately disposed of that property, or where it is currently located, has no bearing on their claims that Wells committed various torts by failing to include it in the estate. Moreover, even if the plaintiffs were unaware of every detail regarding their claims by July 2005, they were on notice of the claims and had a duty diligently to pursue them at that time.

**B.      Continuing Tort Doctrine**

The plaintiffs next argue that New Jersey's "continuing tort doctrine" delayed the accrual of their causes of action until May 2011, when Wells sold the Jaguar that had once belonged to Walker. *See* Dkt. 76 at 3–6. Under that doctrine, "when an individual experiences a 'continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases.'" *Roa v. Roa*, 985 A.2d 1225, 1231 (N.J. 2010) (quoting *Wilson v. Wal-Mart Stores*, 729 A.2d 1006, 1010 (N.J. 1999)). "The premise underlying the doctrine is that the conduct becomes actionable because of its 'continuous, cumulative, synergistic nature.'" *See id.* (quoting *Wilson*, 729 A.2d at 1011). Here, the plaintiffs argue that the doctrine operates to delay the accrual of their claims until May 2011, when Wells sold the car that had formerly belonged to Walker. Dkt. 76 at 5. They argue that this sale was Wells's "last over[t] act in furtherance of his scheme to convert Walker Estate assets to himself." *Id.* But there are several problems with the plaintiffs' effort to invoke the continuing tort doctrine in this context.

First, it is not at all clear that New Jersey courts would apply the continuing tort doctrine to a scheme of the kind that the plaintiffs describe—that is, a scheme involving a course of discrete fraudulent or tortious acts. To the Court's knowledge, New Jersey courts have applied

the continuing tort doctrine only in two contexts: (1) in employment discrimination cases in which plaintiffs allege "a pattern or series of acts, any one of which may not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work environment," *see Roa*, 985 A.2d at 1232 (quoting *Shepherd v. Hunterdon Dev. Ctr.*, 803 A.2d 611, 623 (N.J. 2002)); and (2) in trespass and nuisance cases in which plaintiffs allege "that the defendant is committing a new tort, including a new breach of duty, each day, triggering a new statute of limitations," *see Russo Farms, Inc. v. Vineland Bd. of Educ.*, 675 A.2d 1077, 1084 (N.J. 1996). Even assuming that the New Jersey courts would expand the reach of the doctrine beyond these employment cases and trespass and nuisance cases, the plaintiffs offer no basis to believe that the reasoning employed by those courts might apply here.[5]

The rationale underlying the first line of cases—employment discrimination cases in which plaintiffs allege acts that, taken together, make out a hostile work environment claim— does not encompass a case, like this one, involving allegations of *discrete* fraudulent or tortious acts. Indeed, the New Jersey Supreme Court has rejected just such an argument in the context of employment discrimination claims, embracing the Supreme Court's approach in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), and explaining that "the continuing violation theory . . . does not permit the aggregation of discrete discriminatory acts for the

---

[5] Although the case law applying the continuing violation doctrine has been characterized as "confusing, incoherent, and inconsistent," *see* Elad Peled, *Rethinking the Continuing Violation Doctrine: The Application of Statutes of Limitations to Continuing Tort Claims*, 41 Ohio N.U. L. Rev. 343, 346 & n.8 (2015) (collecting authority), the categories in which the New Jersey cases principally fall reflect the two primary forms of the rule recognized in the commentary, *see id.* at 352; Kyle Graham, *The Continuing Violations Doctrine*, 43 Gonz. L. Rev. 271, 283 (2008) (distinguishing between cases in which the doctrine "*aggregates* wrongs to permit recovery for harm suffered *outside* of the limitations period" and cases in which the doctrine "*divides* causes of action to create new claims and allow recovery for harms suffered *within* the limitations period").

purpose of reviving an untimely act of discrimination that the victim knew or should have known was actionable." *Roa*, 985 A.2d at 1233. For this same reason, the continuing violation theory does not apply to the plaintiffs' claims that Wells misappropriated a share of Walker's residence before she died, that he misled Jarvis regarding the size of the estate and fraudulently convinced him to waive his rights in the estate in exchange for inadequate compensation, and that he subsequently appropriated assets that should have been included in the estate. The allegations are related, but—unlike a claim for hostile work environment—they involve a series of discrete torts, each of which (like a discrete discrimination claim) is independently actionable.

The second line of cases—nuisance and trespass cases in which plaintiffs allege that the defendant's torts effectively recur on a daily basis—do no more for the plaintiffs, because these cases do not permit plaintiffs to recover for *all* of a defendant's actions, only those that occur within the relevant statute of limitations. *See Russo Farms*, 675 A.2d at 1087 ("If an individual assaults another person on a continuing basis extending over several years, each new assault is a battery, because the attack itself includes every element of a new tort. If the first attack is barred by the statute of limitations, more recent claims may not be barred because each asserts a new tort."). Such a rule would not permit the plaintiffs to revive their untimely claims.

Second, even if New Jersey law would allow courts to apply the continuing tort doctrine to a series of fraudulent acts, the plaintiffs have not made out a claim that Wells engaged in such a course of conduct here—at least not one that continued to a timeframe within the limitations period. The plaintiffs describe only two tortious acts that Wells allegedly committed within the limitations period. The first is Wells's sale in May 2011 of a Jaguar automobile that had once belonged to Walker. *See* Dkt. 76 at 5–6. But the plaintiffs offer no theory under which the sale of the Jaguar to a third party could be understood as a tortious act. The plaintiffs can identify no

misrepresentation that accompanied the sale of the Jaguar, as required to make out a fraud claim in connection with the sale. *See, e.g.*, *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 368 (N.J. 1997). Nor do they claim that Wells converted the Jaguar to his own use in 2011—indeed, to the contrary, record evidence demonstrates that he obtained title to the vehicle in 2004. *See* Dkt. 69-8 at 2 (Pls.' Reply, Ex. F). Even if Wells committed some tort regarding the Jaguar at some prior point—for instance, by omitting its value from his statements regarding the value of Walker's estate, failing to mention its existence to Jarvis, or converting it for his own use—the plaintiffs cannot explain why Wells's eventual sale of the car in 2011 was tortious. The plaintiffs also contend that, as late as December 6, 2007, Wells sought to "cover his tracks" and "fraudulently [to] conceal his theft of Walker Estate assets by filing with the New Jersey Surrogate Court the Jarvis Bond Release secured through fraudulent inducement and duress." Dkt. 76 at 6. But the plaintiffs again offer no theory under which the filing of the bond release was *itself* a tortious act, or even why it might have been improper under New Jersey law. And to the extent the plaintiffs contend that the New Jersey court was misled, their remedy lies there, and not before this Court.

Finally, the plaintiffs cite several out-of-jurisdiction cases that they claim support their argument, Dkt. 76 at 4–5, but none in fact aids the plaintiffs. As an initial matter, the plaintiffs' suggestion that any of these cases is binding here is difficult to fathom. They characterize three precedents, for example, as "Third Circuit decisions (of which New Jersey is a part)," *id.* at 4, but all three are decisions of the Pennsylvania state courts—not decisions of the U.S. Court of Appeals for the Third Circuit. The fact that the *federal* courts in Pennsylvania and New Jersey are both part of the Third Circuit does not suggest that the decisions of the Pennsylvania *state* courts inform the meaning of New Jersey law. And the plaintiffs' assertion that a decision from the Illinois Appellate Court constitutes "***mandatory*** precedent to this Court," *id.* at 4 (emphasis

in original), defies comprehension.  And, even to the extent these decisions might serve as persuasive authority, they do the plaintiffs little good.  The Pennsylvania cases the plaintiffs cite do, as they observe, "apply" the continuing tort doctrine to intentional tort claims, but only to reject plaintiffs' arguments that that doctrine could salvage their claims for discrete torts occurring outside the statute of limitations.  *See CBG Occupational Therapy Inc. v. Bala Nursing & Ret. Ctr.*, No. 03-1758, 2005 WL 280838, at *3 (Pa. Ct. Com. Pl. Jan. 27, 2005); *Dellape v. Murray*, 651 A.2d 638, 640 (Pa. Commw. Ct. 1994).  The results reached by the courts in the Illinois cases cited by the plaintiffs are likewise consistent with the Court's decision, although perhaps better explained by the "discovery rule" embraced in New Jersey and other states.  *See, e.g.*, *Field v. First Nat'l Bank of Harrisburg*, 619 N.E.2d 1296, 1298 (Ill. App. Ct. 1993) (finding delayed accrual in case in which defendants engaged in "four-year course of conduct" and plaintiff "discovered this course of conduct" only after his father's death); *accord Haddad's of Ill., Inc. v. Credit Union 1 Credit Union*, 678 N.E.2d 322, 324 (Ill. App. Ct. 1997).

Because the plaintiffs have not demonstrated the existence of any actionable conduct that falls within the six-year limitations period, they cannot avail themselves of the continuous tort doctrine.

## C.     Equitable Tolling

The plaintiffs finally assert that general principles of equitable tolling law should permit them to bring untimely claims against Wells.  Dkt. 76 at 2–3.  They argue that because they "had no standing to sue [Wells] until [Parker] was removed" as administrator of the Jarvis estate, and because they diligently pursued their rights by attempting to remove Parker as administrator (and then suing him for damages), the Court should toll the statute of limitations for the period of time between July 2005, when they filed their complaint in D.C. Superior Court, and November 2012,

when Brown, the successor representative, closed the Jarvis estate. *Id.* at 3. They rely primarily on the Court's equitable powers, but also analogize their argument to the "adverse domination doctrine," under which courts may toll statutes of limitations governing claims against corporate directors where "a corporate plaintiff is controlled by the alleged wrongdoers," *In re MacGregor Sporting Goods, Inc.*, 199 B.R. 502, 515 (D.N.J. 1995); *see also Freeland v. Enodis Corp.*, 540 F.3d 721, 741 (7th Cir. 2008). In essence, the plaintiffs argue, the statute of limitations should have been tolled during the period in which they *would* have brought their claims but *could* not do so. The Court declines to toll the statute on this basis.

To begin with, the Court rejects the plaintiffs' efforts to invoke the "adverse domination doctrine," which "tolls the statute of limitations for claims by a corporation against its officers and directors while the corporation is controlled by those wrongdoing officers and directors." *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012) (quoting *Lease Resolution Corp. v. Larney*, 719 N.E.2d 165, 170 (Ill. App. Ct. 1999)). That doctrine, in all the states that have recognized it,[6] is limited to claims brought by a corporation against its former directors and their alleged co-conspirators—that is, against those persons who "dominated" the corporation and wrongfully prevented it from pursuing its claims, or those who have conspired with them. *See, e.g.*, 3A William M. Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 1306.20 (rev. ed. 2011); *Indep. Tr. Corp.*, 665 F.3d at 937 (explaining that, under Illinois law, "a plaintiff's allegations must establish that the defendant was complicit in the wrongdoing of the directors for the adverse domination doctrine to toll the statute of limitations"); *Buchwald v.*

---

[6] New Jersey courts do not appear to have recognized the doctrine. *See In re Payroll Express Corp.*, 186 F.3d 196, 206 (2d Cir. 1999) ("New Jersey has not adopted the adverse domination theory."). But that question is of limited relevance, given that the doctrine would not, in any event, apply in this case.

*Citibank, N.A.*, No. 13-cv-210, 2013 WL 5218579, at *4 (D.D.C. Sept. 17, 2013) (to similar effect).

The plaintiffs here are attempting to do something quite different: they are attempting to revive claims that Jarvis—and, later, the administrator of his estate—could have brought, but did not. Jarvis and the administrators of his estate did not fail to bring these claims because—as in adverse-domination cases—they were *implicated* in them. *Cf. Freeland*, 540 F.3d at 741 ("The . . . adverse domination doctrine is premised upon the principle that officers and directors who have harmed the entity cannot be expected to take legal action against themselves."). They did not bring the present claims because they either were not aware of them, they concluded that they lacked merit, or—exercising their judgment as fiduciaries—they concluded that it was not in the best interest of the estate (*i.e.*, in light of the cost, likelihood of success, and potential for delay) to pursue the claims. *Cf.* Dkt. 76 at 2–3 (explaining that Brown "declined to diligently investigate or pursue the administration of the Walker Estate over repeated requests by Plaintiffs that she do so"). The adverse domination doctrine has no role in such a case. Indeed, even if applicable to the administration of an estate, all that the doctrine would do is permit a beneficiary to sue a trustee or administrator who declined to pursue a claim against him or herself. The plaintiffs here have already tried that here: they brought suit against Parker and Brown in this Court over their failure to pursue the very claims at issue here. *See Jarvis*, 13 F. Supp. 3d at 75; *Lewis*, 67 F. Supp. 3d at 199. The fact that they obtained no relief in those suits does not mean that they may now bring the claims that Jarvis, Parker, and Brown declined to advance.

For essentially the same reasons, the Court declines to exercise its equitable powers to toll the statute of limitations. It is true, as the plaintiffs contend, that they have attempted to remedy what they view as an injustice. And it is true that New Jersey courts have recognized

that, in some cases, "the filing of a lawsuit itself shows the proper diligence on the part of the plaintiff [that] statutes of limitations were intended to insure." *Galligan v. Westfield Ctr. Serv., Inc.*, 412 A.2d 122, 125 (N.J. 1980). But this is not a case where plaintiffs' attempts to pursue a cause of action have been defeated by the application of some "mechanistic" or technical rule. *Id.* It is a case in which others—first Jarvis and then the administrators of his estate—failed to bring suit, and none of those individuals had the type of conflict of interest that might justify ignoring *their* lack of diligence, if any. It is not unusual that a successor or beneficiary of a trust or estate is put in a position in which he must rely on others to protect his indirect interests. But that does not mean that the statute of limitations is tolled for years—or even decades—while he waits on the sidelines. Jarvis or the administrators of his estate could have brought suit if they were convinced that a cognizable wrong occurred, and their failure to do so does not mean that Wells must defend an action that could have been brought many years ago.

The plaintiffs have tried to employ many different causes of action in many different fora against many different defendants in an effort to reach assets that they claim should have been included in the accounting of an estate over fifteen years ago. It may be that the plaintiffs are correct, and that Wells's failure to convey these assets to Jarvis was negligent, fraudulent, or simply unjust; the Court is in no position to say. But the time for bringing such claims against him has long since passed.

On these facts, the Court thus finds no basis for equitable tolling.

**CONCLUSION**

For these reasons, the Court will grant Wells's motion for summary judgment, Dkt. 67, and will deny the plaintiffs' cross-motion for summary judgment, Dkt. 57. A separate Order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: July 1, 2016